**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**Milwaukee Division**

| | | |
|---|---|---|
| CYTOPHIL, INC., | ) | |
| Plaintiff, | ) | Case No.: |
| | ) | |
| v. | ) | Judge |
| | ) | |
| MERZ NORTH AMERICA, INC. and | ) | Magistrate Judge |
| MERZ PHARMA GMBH & CO. KGAA, | ) | |
| Defendants. | ) | |

---

## COMPLAINT

---

NOW COMES Plaintiff, CYTOPHIL, INC., ("Cytophil"), and as a complaint against the above-named Defendants, MERZ NORTH AMERICA, INC. ("Merz N.A.") and MERZ PHARMA GMBH & CO. KGAA ("Merz Pharma"), hereby states as follows:

### Parties

1. Cytophil is a corporation formed under the laws of the State of Delaware having its principal place of business at 2485 Corporate Circle, Suite 2, East Troy, Wisconsin, 53120.

2. Upon information and belief, Merz N.A. is a corporation formed under the laws of the State of North Carolina, which has property and transacts business within this judicial district, including without limitation at its manufacturing and distribution facility in this judicial district.

3. Upon information and belief, Merz Pharma, a company headquartered in Germany, is the parent company and sole owner of Merz N.A. and transacts business in this judicial district.

### Jurisdiction and Venue

4. This action arises under 35 U.S.C. §292 and §285, 15 U.S.C. §2 and §15 and the common law of the State of Wisconsin. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§1331, 1337, §1338(a) and (b), and 35 U.S.C. §292(b).

5. This Court also has supplemental jurisdiction under 28 U.S.C. §1367(a) and the doctrine of pendent jurisdiction.

6. This Court also has personal jurisdiction over Defendants (collectively "Merz") under Wis. Stat. §§801.05(1)(d), 801.05(3) and 801.05(4)(a) and (b).

7. Personal jurisdiction in this state and venue in this judicial district pursuant to 28 U.S.C. §1391(b)(2) are proper because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, such events or omissions including, upon information and belief, the false patent marking by Merz which is a subject of this lawsuit as well as other conduct by Merz including without limitation manufacture, packaging, advertisement, sale, offer for sale, shipping and distribution of Merz's falsely marked products, relevant to all claims in this lawsuit.

8. Personal jurisdiction in this state and venue in this judicial district pursuant to 28 U.S.C. §1391(b)(2) are also proper because: a substantial part of the property that is the subject of the action is situated in this judicial district, including, upon information and belief, property at Merz's premises in this judicial district, such as Merz's relevant manufacturing, packaging and distribution facilities and operations; Merz's products bearing the false patent marking which is a subject of this lawsuit, which also bear information indicating that such products are manufactured in Franksville, Wisconsin (in this judicial district); and related printed matter intended by Merz for nationwide distribution from this judicial district.

9. Personal jurisdiction in this state and venue in this judicial district pursuant to 28 U.S.C. §1391(b)(1) are also proper because Merz is resident in this judicial district as defined by 28 U.S.C. §1391(c)(2).

2

10. Upon information and belief, Defendants are highly integrated with Merz N.A. being an alter ego of Merz Pharma, and vice versa, and Merz N.A. officers and employees, including in this judicial district, reporting directly to Merz Pharma executive management in Germany.

## Relevant Markets and Products

11. Cytophil and Merz are engaged in direct competition against each other in particular specialized medical device markets

12. Cytophil and Merz are direct competitors in the United States market for gel-only injectable vocal cord medialization systems that are volumizing soft tissue filler products classified under the United States Food and Drug Administration's "MIX" product code (hereinafter "the Gel Product Market").

13. In the Gel Product Market, Cytophil manufacturers, offers and sells a product known as RENÚ® GEL, and Merz manufactures, offers and sells competing products known variously as Prolaryn Gel, Prolaryn Voice Gel and Radiesse Voice Gel (hereinafter "Merz Gel Products").

14. Upon information and belief, Merz's share of the Gel Product Market in the United States is greater than 98 percent.

15. Cytophil and Merz are also direct competitors in a United States market for other injectable vocal cord medialization systems that are volumizing soft tissue filler products classified under the United States Food and Drug Administration's "MIX" product code, specifically the market for such injectable systems that consist of Calcium Hydroxylapatite (hereinafter "CaHA") particles suspended in an aqueous gel carrier (hereinafter "the Particle Suspension Product Market").

16. In the Particle Suspension Product Market, Cytophil manufacturers, offers and sells a product known as RENÚ® VOICE, and Merz manufactures, offers and sells competing products

3

known variously as Prolaryn Plus, Radiesse Voice and, simply, Radiesse (hereinafter "Merz Particle Suspension Products").

17. Upon information and belief, Merz's share of the Particle Suspension Product Market in the United States is greater than 98 percent.

### The '574 Patent

18. Merz N.A. claims to be the owner, by assignment, of all right, title, and interest in and to United States Patent No. 6,537,574 (hereinafter "the '574 Patent"), entitled, "Soft Tissue Augmentation Material."

19. The named inventor of the '574 Patent is William G. Hubbard.

20. Dr. Hubbard, the named inventor, is the founder and Chief Executive Officer of Cytophil and is highly knowledgeable about the content and scope of the '574 Patent.

21. All claims of the '574 Patent cover a method for augmenting tissue comprising introducing at a desired site a material including ceramic particles that are "rounded," "substantially spherical" and "substantially non-resorbable."

22. The express language of the patent clearly and unambiguously limits the scope of the patent claims by defining the term "rounded" to require that the particles "do not have any sharp or angular edges," and the patentee in June 2001 also issued a binding statement to the United States Patent & Trademark Office that the particles must be "devoid of sharp or angular edges."

23. The express language of the patent clearly and unambiguously limits the scope of the patent claims by defining the term "substantially spherical" to require that "most of the particles of the present invention are sphere-like in their shape, i.e., they are spheroidal."

24. Additionally, the patentee made binding statements to the United States Patent & Trademark Office prior to grant of the '574 Patent, defining the term "substantially spherical"

4

such that particles having a D-ratio of 0.92 or higher are "substantially spherical" but particles having a D-ratio of 0.90 or lower are not "substantially spherical," a "D-ratio" being a dimensionless scalar value defined by the ratio of the diameter of a circle of a particle's cross-sectional area to the maximum measured diameter (connecting the perimeter of the particle cross-section through the mass centroid), such that a perfect sphere would have a D-ratio of 1.

25. The express language of the patent clearly and unambiguously limits the scope of the patent claims, for example by requiring that "the particles must be sufficiently large so as to avoid phagocytosis" and by describing the particles as "permanent."

26. Additionally, prior to grant of the '574 Patent, the patentee made binding, clear and unambiguous statements to the United States Patent & Trademark Office concerning the meaning of "substantially non-resorbable" and concerning related characteristics of particles used in the patented invention.

27. For example, prior to grant of the '574 Patent, the patentee stated to the United States Patent & Trademark Office that the particles used in the patented invention "must avoid phagocytosis," a requirement also set forth in the patent itself.

28. In another example, prior to grant of the '574 Patent, the patentee stated to the United States Patent & Trademark Office that the particles used in the patented invention are "permanent" in the body.

29. In another example, prior to grant of the '574 Patent, the patentee stated to the United States Patent & Trademark Office that the particles used in the patented invention are the "opposite" in character to "particles [that] ... dissolve *in vivo*."

5

30. In another example, prior to grant of the '574 Patent, the patentee stated to the United States Patent & Trademark Office that the particles used in the patented invention are "not supposed to go back in the body."

31. In another example, prior to grant of the '574 Patent, the patentee stated to the United States Patent & Trademark Office that the particles used in the patented invention "stay put" in the body.

32. In another example, prior to grant of the '574 Patent, the patentee stated to the United States Patent & Trademark Office that absorption of particles in the body is "absolutely contrary" to the patented invention.

33. In another example, prior to grant of the '574 Patent, the patentee stated to the United States Patent & Trademark Office that the particles used in the patented invention "remain in place permanently ... at the augmentation site."

34. Further express language of the patent and related statements by the patentee to the to the United States Patent & Trademark Office also clearly and unambiguously limit the scope of the patent claims by requiring that each and every particle lacks each and every one of the following features: any sharp edge, any edge that defines an angle, any textured porous surface, any opening or hole, any jagged surface, any irregularity in form (such as non-smooth, uneven, non-uniform and/or asymmetrical surface texture or overall form), and any straight edge.

35. Both Cytophil and Merz are fully aware, and have been aware for years, of the scope limitations of the '574 Patent which are described in foregoing paragraphs 21-34.

36. Upon information and belief, Merz's longstanding awareness of such scope limitations includes information obtained at least from the patent itself and the patent file history,

6

from BioForm Medical, Inc. (hereinafter "Bioform"), the entity which previously owned the patent and was acquired in 2010 by Merz Pharma, from former BioForm employees, from testing, sampling and documentation, from Cytophil, and from counsel.

## Non-Coverage Under the '574 Patent

37.  The Merz Gel Products contain gel only and do not include any particles of any kind.

38.  Merz is fully aware and has always been aware that the Merz Gel Products contain gel only and do not include any particles of any kind, including any ceramic particles of the kind required by the '574 Patent, and that accordingly the Merz Gel Products are not covered by the '574 Patent or used in the method of the '574 Patent.

39.  The Merz Particle Suspension Products do not have particles of the kind required by the '574 Patent.

40.  Merz is fully aware and, upon information and belief, has always been aware that the Merz Particle Suspension Products do not have ceramic particles of the kind required by the '574 Patent, and that accordingly the Merz Particle Suspension Products are not covered by the '574 Patent or used in the method of the '574 Patent.

41.  For years, the Merz Particle Suspension Products have been advertised as including gel and particles, both of which are absorbed by the body into which they are injected, such particle absorption being contrary to the non-resorbability requirement of the '574 Patent.

42.  For example, a current page of the Merz-controlled website *www.radiesse.com* describes resorption of the Merz Particle Suspension Products as follows: "The CaHA microspheres naturally degrade to calcium and phosphate ions, which are metabolized by the body's normal processes."

7

43. In another example, a video currently published on the Merz-controlled website *www.radiesse.com* describes resorption of the Merz Particle Suspension Products as follows: "The RADIESSE particles are ... naturally metabolized by your body's macrophages."

44. In another example, a current page of the Merz website *www.radiessemen.com* describes resorption of the Merz Particle Suspension Products as follows: "Over time, the body absorbs the microspheres and gel, leaving behind only natural collagen."

45. In another example, a 2011 Merz brochure described resorption of the Merz Particle Suspension Products as follows: "Ultimately, CaHA particles start to degrade and are metabolized by macrophages."

46. The Merz website *www.prolaryn.com* currently makes the same statement describing resorption of the particles in Prolaryn Plus: "Ultimately, CaHA particles start to degrade and are metabolized by macrophages."

47. In another example, a 2008 page of the Bioform-controlled website *www.radiesse-fl.com* described resorption of Radiesse as follows: "Over time the tiny calcium-based microspheres gradually break down into calcium and phosphate ions, which are safely and naturally absorbed into your body, leaving your own collagen in their place."

48. In another example, Merz is currently publishing on the website *www.radiesse-fl.com*, which it now owns and controls, a 2006 Bioform brochure describing resorption of Radiesse as follows: "Treatment results are long-lasting, but not permanent. The calcium-based microspheres gradually dissolve and then are safely and naturally absorbed by your body. You have none of the risks sometimes associated with a permanent implant."

49. In yet another example, Merz is currently publishing, and has continually since 2012 published, on its German-language *www.merz.de* website a Radiesse brochure describing

8

resorption of Radiesse as follows: "Radiesse® selbst wird dabei komplett vom Körper abgebaut." Translated to English, the meaning of such German-language statement is: "Radiesse® itself is completely absorbed by the body."

50.  In another example, in a February 27, 2015 Merz presentation to the United States Food and Drug Administration (hereinafter "FDA"), Merz described Radiesse as a "non-permanent" implant having a "known degradation pathway."

51.  Upon information and belief, the particles and gel of the Radiesse product marketed and sold by Merz in Germany are the same particles and gel that are in the Merz Particle Suspension Products marketed and sold by Merz in the United States.

52.  Upon information and belief, the particles and gel of each of the Merz Particle Suspension Products are the same particles and gel that are in the other Merz Particle Suspension Products, the only difference between such products being the product names used by Merz.

53.  Upon information and belief, Merz has for years known that CaHA particles in the Merz Particle Suspension Products have sharp edges, edges defining angles, jagged surfaces and irregularities in form, such as render the Merz Particle Suspension Products outside the scope of the '574 Patent.

54.  Upon information and belief, neither Merz's component specification nor any related manufacturing step of the Merz Particle Suspension Products includes any requirement or check to ascertain that CaHA particles in the Merz Particle Suspension Products have a D-ratio of 0.92 or greater in such products.

55.  RENÚ® GEL does not contain particles of the kind required by the '574 Patent, and accordingly is not covered by the '574 Patent or used in the method of the '574 Patent.

9

56. Both Cytophil and Merz are fully aware, and have been aware for years, that RENÚ® GEL does not have particles of the kind required by the '574 Patent, and that accordingly RENÚ® GEL is not covered by the '574 Patent or used in the method of the '574 Patent.

57. Merz has been fully aware for years that Cytophil knows and understands that RENÚ® GEL does not contain particles of the kind required by the '574 Patent, and that Cytophil knows and understands that RENÚ® GEL is not covered by the '574 Patent or used in the method of the '574 Patent.

58. RENÚ® VOICE does not contain particles of the kind required by the '574 Patent, and accordingly is not covered by the '574 Patent or used in the method of the '574 Patent.

59. Both Cytophil and Merz are fully aware, and have been aware for years, that RENÚ® VOICE does not have particles of the kind required by the '574 Patent, and that accordingly RENÚ® VOICE is not covered by the '574 Patent or used in the method of the '574 Patent.

60. Merz has been fully aware for years that Cytophil knows and understands that RENÚ® VOICE does not contain particles of the kind required by the '574 Patent, and that Cytophil knows and understands that RENÚ® VOICE is not covered by the '574 Patent or used in the method of the '574 Patent.

## COUNT I – FALSE MARKING UNDER 35 U.S.C. §292
## AS TO THE MERZ GEL PRODUCTS

61. Paragraphs 1-60 are realleged and incorporated by reference as if fully set forth herein.

62. In past and current advertisements for the Merz Gel Products, Merz has stated falsely that such products are covered by the '574 Patent.

10

63.  For example, Merz's packaging for Prolaryn Gel bears the statement: "Protected by U.S. Patent 6,537,574."

64.  In 2015, Cytophil urged Merz to remove such false patent marking from the Merz Gel Products, but Merz has not done so.

65.  Upon information and belief, Merz's purposes in falsely marking the Merz Gel Products as if covered by the '574 Patent are: to deceive the public, including at least by creating a false public impression that Merz has an exclusive right to make, offer and sell products like the Merz Gel Products; to create a false public impression as to the scope of the '574 Patent; and to suppress and chill competition in the Gel Product Market in the United States.

66.  Such Merz conduct and resulting false impressions have unfairly and unlawfully benefitted Merz's business, and have been to the unfair and unlawful disadvantage of Cytophil, Merz's competitor.

67.  Cytophil has suffered a competitive injury as a result of the Merz's false patent marking in connection with the Merz Gel Products.

### COUNT II – FALSE MARKING UNDER 35 U.S.C. §292 AS TO THE MERZ PARTICLE SUSPENSION PRODUCTS

68.  Paragraphs 1-67 are realleged and incorporated by reference as if fully set forth herein.

69.  In past and current advertisements for the Merz Particle Suspension Products, Merz has stated falsely that such products are covered by the '574 Patent.

70.  For example, Merz's packaging for Radiesse Voice bears the statement: "Protected by U.S. Patent 6,537,574."

11

71. Despite Cytophil's pointing out to Merz in 2015 the falsity of such patent marking on the Merz Particle Suspension Products, Merz has continued to falsely mark such products.

72. Upon information and belief, Merz's purposes in falsely marking the Merz Particle Suspension Products as if covered by the '574 Patent are: to deceive the public, including at least by creating a false public impression that Merz has an exclusive right to make, offer and sell products like the Merz Particle Suspension Products; to create a false public impression as to the scope of the '574 Patent; and to suppress and chill competition in the Particle Suspension Product Market in the United States.

73. Such Merz conduct and resulting false impressions have unfairly and unlawfully benefitted Merz's business, and have been to the unfair and unlawful disadvantage of Cytophil, Merz's competitor.

74. Cytophil has suffered a competitive injury as a result of Merz's false patent marking in connection with the Merz Particle Suspension Products.

**COUNT III – VIOLATION OF SHERMAN ACT §2**
**AS TO THE PARTICLE SUSPENSION PRODUCT MARKET**

75. Paragraphs 1-74 are realleged and incorporated by reference as if fully set forth herein.

76. By falsely marking and advertising the Merz Particle Suspension Products as if covered by the '574 Patent in the knowledge that such products are not so covered, Merz has attempted to falsely and unlawfully assert, obtain and maintain monopoly power in the Particle Suspension Product Market in the United States.

77. Merz has also filed and is prosecuting, at high expense to Cytophil, a federal patent infringement lawsuit against Cytophil in connection with Cytophil's making, using, offering to

12

sell and selling RENÚ® VOICE, despite Merz's knowledge that RENÚ® VOICE does not have particles of the kind required by the '574 Patent, and that accordingly RENÚ® VOICE is not covered by the '574 Patent or used in the method of the '574 Patent.

78. Merz has stated that its federal patent infringement lawsuit against Cytophil is based on past statements by Cytophil that RENÚ® VOICE is "identical" to the Merz Particle Suspension Products. However, given Merz's knowledge that the Merz Particle Suspension Products do not have particles of the kind required by the '574 Patent, and that accordingly the Merz Particle Suspension Products are not covered by the '574 Patent or used in the method of the '574 Patent, Merz is fully aware that such past Cytophil statements provide no basis whatsoever for Merz's lawsuit against Cytophil.

79. Although Merz has endeavored to give its filing and prosecution of its federal patent infringement lawsuit against Cytophil the appearance of some intent to serve a lawful purpose, upon information and belief Merz has not had any intention for such lawsuit to serve a lawful purpose, and such lawsuit has in all aspects at all times been objectively meritless such that it has lacked any potential lawful purpose; such lawsuit was and is a mere sham to cover and serve Merz's predatory purpose and intent.

80. Upon information and belief, Merz has made knowingly false and groundless public statements, including without limitation to the press and to market participants, asserting that the '574 Patent covers the Merz Particle Suspension Products – an assertion that Merz knew (and knows) to be false and likely to result in pecuniary loss by Cytophil.

81. Upon information and belief, Merz has made knowingly false and groundless public statements, including without limitation to the press and to market participants, asserting that Cytophil's offering and selling of RENÚ® VOICE infringes the '574 Patent – an assertion that

13

Merz knew (and knows) to be false, damaging to the reputation of Cytophil and its products, and likely to result in pecuniary loss by Cytophil.

82. Upon information and belief, Merz has made knowingly false and groundless public statements, including without limitation to the press and to market participants, asserting that Cytophil knew its offering and selling of RENÚ® VOICE would infringe the '574 Patent – an assertion that Merz knew (and knows) to be false, damaging to the reputation of Cytophil and its products, and likely to result in pecuniary loss by Cytophil.

83. Upon information and belief, Merz has made knowingly false and groundless public statements, including without limitation to the press and to market participants, asserting that Cytophil's offering and selling of RENÚ® VOICE infringes additional Merz-held patents – an assertion that Merz knew (and knows) to be false, damaging to the reputation of Cytophil and its products, and likely to result in pecuniary loss by Cytophil.

84. Upon information and belief, Merz has made knowingly false and groundless public statements, including without limitation to the press and to market participants, asserting that Cytophil's offering and selling of RENÚ® GEL infringes the '574 Patent – an assertion that Merz knew (and knows) to be false, damaging to the reputation of Cytophil and its products, and likely to result in pecuniary loss by Cytophil.

85. Upon information and belief, Merz has made knowingly false and groundless public statements, including without limitation to the press and to market participants, asserting that Cytophil knew its offering and selling of RENÚ® GEL would infringe the '574 Patent – an assertion that Merz knew (and knows) to be false, damaging to the reputation of Cytophil and its products, and likely to result in pecuniary loss by Cytophil.

14

86.  Upon information and belief, Merz has made knowingly false and groundless public statements, including without limitation to the press and to market participants, asserting that Cytophil's offering and selling of RENÚ® GEL infringes additional Merz-held patents – an assertion that Merz knew (and knows) to be false, damaging to the reputation of Cytophil and its products, and likely to result in pecuniary loss by Cytophil.

87.  Upon information and belief, Merz has made knowingly false and groundless public statements, including without limitation to the press and to market participants, asserting that Cytophil's offering and selling of RENÚ® VOICE and RENÚ® GEL has infringed patents held by Merz since 2003 – an assertion that Merz knew (and knows) to be false, damaging to the reputation of Cytophil and its products, and likely to result in pecuniary loss by Cytophil.

88.  Upon information and belief, Merz has made knowingly false and groundless public statements, including without limitation to the press and to market participants, asserting at least by implication that Cytophil's chief business officer had, in the marketing of RENÚ® VOICE and RENÚ® GEL, acted in violation of alleged confidentiality-related obligations to Merz.

89.  The Merz public statements described in foregoing paragraphs 80-88 resulted in publication and interstate distribution, nationwide and internationally, of Merz's knowingly false assertions, including at least over the Internet through news media operated by American City Business Journals, Inc., in connection with the Google® News news aggregator operated by Google, Inc., in connection with the "WN Network" news aggregator operated by World News Inc., and by re-publication of such statements in other interstate media including without limitation the "Sun-Times Network" of the Chicago Sun-Times.

90.  Upon information and belief, the actual purpose and specific intent of Merz's conduct described herein has been to suppress, foreclose and destroy existing and foreseeable

15

lawful competition in the Particle Suspension Product Market in the United States, including without limitation such competition by Cytophil, to interfere directly with the business activities, prospective business activities, relationships and prospective relationships of Cytophil, to monopolize the Particle Suspension Product Market in the United States, to maintain Merz's monopoly power in such market, and to cause pecuniary loss by Cytophil.

91. By engaging in such conduct while having, upon information and belief, a share of the Particle Suspension Product Market in the United States of greater than 98 percent, Merz has in fact acquired and maintained monopoly power in such market.

92. At least by the conduct alleged herein, Merz has unlawfully restrained competition in the Particle Suspension Product Market in the United States, for example, by imposing increased costs of entry and competition against competitors, including Cytophil.

93. But for Merz's conduct, including at least as alleged herein, the Particle Suspension Product Market in the United States, upon information and belief, would presently be and in recent years would have been characterized by greater product choice, greater price competition and lower prices than presently exist and than have existed. Such conditions would have redounded to the specific benefit of the consuming public and the specific benefit of Cytophil as a competitor in the Particle Suspension Product Market in the United States.

94. Merz has acted in violation of Section 2 of the Sherman Act (15 U.S.C. §2), including at least by the conduct alleged herein.

95. As a direct result of Merz's conduct, at least as alleged herein, Cytophil has been injured in its business and property and has suffered related damages, and Cytophil continues to suffer such injury and related damages.

16

96. Under Section 4 of the Clayton Act (15 U.S.C. §15), Cytophil is entitled to recover threefold the damages sustained in connection with Merz's violation of 15 U.S.C. 2 and also to recover the cost of this suit including reasonable attorneys' fees.

## COUNT IV – VIOLATION OF SHERMAN ACT §2
## AS TO THE GEL PRODUCT MARKET

97. Paragraphs 1-96 are realleged and incorporated by reference as if fully set forth herein.

98. By falsely marking and advertising the Merz Gel Products as if covered by the '574 Patent in the knowledge that such products are not so covered, and by making knowingly false public statements as alleged herein, Merz has attempted to falsely and unlawfully assert, obtain and maintain monopoly power in the Gel Product Market in the United States.

99. Upon information and belief, the actual purpose and specific intent of Merz's conduct described herein has been to suppress, foreclose and destroy existing and foreseeable lawful competition in the Gel Product Market in the United States, including without limitation such competition by Cytophil, to interfere directly with the business activities, prospective business activities, relationships and prospective relationships of Cytophil, to monopolize the Gel Product Market in the United States, to maintain Merz's monopoly power in such market, and to cause pecuniary loss by Cytophil.

100. By engaging in such conduct while having, upon information and belief, a share of the Gel Product Market in the United States of greater than 98 percent, Merz has in fact acquired and maintained monopoly power in such market.

17

101.  At least by the conduct alleged herein, Merz has unlawfully restrained competition in the Gel Product Market in the United States, for example, by imposing increased costs of entry and competition against competitors, including Cytophil.

102. But for Merz's conduct, including at least as alleged herein, the Gel Product Market in the United States, upon information and belief, would presently be and in recent years would have been characterized by greater product choice, greater price competition and lower prices than presently exist and than have existed.  Such conditions would have redounded to the specific benefit of the consuming public and the specific benefit of Cytophil as a competitor in the Gel Product Market in the United States.

103.  Merz has acted in violation of Section 2 of the Sherman Act (15 U.S.C. §2), including at least by the conduct alleged herein.

104.  As a direct result of Merz's conduct, at least as alleged herein, Cytophil has been injured in its business and property and has suffered related damages, and Cytophil continues to suffer such injury and related damages.

105.  Under Section 4 of the Clayton Act (15 U.S.C. §15), Cytophil is entitled to recover threefold the damages sustained in connection with Merz's violation of 15 U.S.C. §2 and also to recover the cost of this suit including reasonable attorneys' fees.

## COUNT V – COMMERCIAL DISPARAGEMENT

106.  Paragraphs 1-105 are realleged and incorporated by reference as if fully set forth herein.

107.  By Merz's knowingly false public statements concerning Cytophil and Cytophil products as alleged herein, including without limitation by such Merz statements as described in foregoing paragraphs 80-88 and by such Merz statements made in connection with Merz's sham

18

federal patent infringement litigation against Cytophil, Merz has, upon information and belief, acted with intent to cause pecuniary loss by Cytophil and reputational injury to Cytophil.

108. Such Merz conduct has in fact caused such pecuniary loss by Cytophil.

109. Such Merz conduct has in fact cause such reputational injury to Cytophil.

110. Under the common law, such Merz conduct constitutes unlawful commercial disparagement by Merz against Cytophil.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Cytophil, prays that this Court enter judgment in its favor and against Merz as follows:

A. An entry of judgment in favor of Cytophil and against Merz that Merz has violated 35 U.S.C. §292 as to the Merz Gel Products;

B. An entry of judgment in favor of Cytophil and against Merz that Merz has violated 35 U.S.C. §292 as to the Merz Particle Suspension Products;

C. An entry of judgment in favor of Cytophil and against Merz that Merz has violated 15 U.S.C. §2 as to the Gel Product Market in the United States;

D. An entry of judgment in favor of Cytophil and against Merz that Merz has violated 15 U.S.C. §2 as to the Particle Suspension Product Market in the United States;

E. An entry of judgment in favor of Cytophil and against Merz that Merz has engaged in unlawful commercial disparagement against Cytophil;

F. An award of damages to Cytophil in an amount adequate to compensate Cytophil for its injury in connection with Merz's violation of 35 U.S.C. §292 as to the Merz Gel Products;

19

G. An award of damages to Cytophil in an amount adequate to compensate Cytophil for its injury in connection with Merz's violation of 35 U.S.C. §292 as to the Merz Particle Suspension Products;

H. An award of damages to Cytophil in an amount including threefold the damages sustained by Cytophil in connection with Merz's violation of 15 U.S.C. §2 as to the Particle Suspension Product Market in the United States, and recovery of the cost of this suit including reasonable attorneys' fees;

I. An award of damages to Cytophil in an amount including threefold the damages sustained by Cytophil in connection with Merz's violation of 15 U.S.C. §2 as to the Gel Product Market in the United States States, and recovery of the cost of this suit including reasonable attorneys' fees;

J. An award of damages to Cytophil in an amount adequate to compensate Cytophil for its injury in connection with Merz's commercial disparagement against Cytophil;

K. Preliminary and permanent injunction enjoining Merz N.A., its parents, owners, subsidiaries, successors, affiliates, officers, directors, agents, servants, employees and attorneys from marking any of the Merz Gel Products (including any product packaging therefor) with any reference to United States Patent No. 6,537,574; from selling, offering to sell, shipping, distributing or publicly displaying any Merz Gel Product so marked; and from distributing or publishing any text, audio or video matter indicating that any of the Merz Gel Products, or any use thereof, is covered by United States Patent No. 6,537,574;

L. Preliminary and permanent injunction enjoining Merz Pharma, its parents, owners, subsidiaries, successors, affiliates, officers, directors, agents, servants, employees

and attorneys from marking any of the Merz Particle Suspension Products (including

any product packaging therefor) with any reference to United States Patent No.

6,537,574; from selling, offering to sell, shipping, distributing or publicly displaying

any Merz Particle Suspension Product so marked; and from distributing or

publishing any text, audio or video matter indicating that any of the Merz Particle

Suspension Products, or any use thereof, is covered by United States Patent No.

6,537,574;

M.  A finding that this case is exceptional within the meaning of 35 U.S.C. §285 for

reason of Merz's conduct, and a related order that Merz pay Cytophil, Inc. its

reasonable attorneys' fees and costs; and

N.  Such other and further relief as this Court or a jury may deem just and proper.

### Jury Demand

Cytophil requests a jury trial.


Dated this 6th day of April, 2016.

Respectfully submitted,

CYTOPHIL, INC.

_____s/*Peter N. Jansson*_____
Peter N. Jansson

Peter N. Jansson (WI Bar # 1012771)
Molly H. McKinley (WI Bar # 1037941)
Eric V.C. Jansson (WI Bar # 1091303)
JANSSON MUNGER McKINLEY & KIRBY LTD.
601 Lake Avenue
Racine, WI 53403
Tel:    (262) 632-6900
Fax:    (262) 632-2257

21

pjansson@janlaw.com
mmckinley@janlaw.com
ejansson@janlaw.com

***Attorneys for Cytophil, Inc.***